

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-12-00004-CV

IN THE INTEREST OF T.L.R.,
MINOR CHILD

----------

FROM COUNTY COURT AT LAW NO. 2 OF WICHITA COUNTY

----------

## MEMORANDUM OPINION[1]

----------

In eight issues, appellant D.S. appeals the trial court's order terminating his parental rights to his son, Terrence Louis Rogers.[2]   He contends that the evidence is legally and factually insufficient to support the grounds for termination and the trial court's finding that termination is in the child's best interest.   We affirm.

### Standard of Review

---

[1]*See* Tex. R. App. P. 47.4.

[2]In accordance with Texas Rule of Appellate Procedure 9.8, we have referred to the child using a pseudonym.  Tex. R. App. P. 9.8.

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001 (West 2011); *see also* § 161.206(a) (West 2008). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2008). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573,

2

574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the verdict with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent engaged in the behavior described in one of the subsections of section 161.001(1) and that the termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *In re H.R.M.*, 209 S.W.3d at 108.

**Sufficiency of the Evidence on Failure to Comply with Service Plan**

In his seventh and eighth issues, appellant contends that the evidence is legally and factually insufficient to support the jury's finding that he failed to comply with the requirements of a court-ordered service plan.

**Applicable Law and Facts**

To terminate parental rights based on Section 161.001(1)(O), a trial court must find by clear and convincing evidence that the parent failed to comply with

the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under family code chapter 262 for the abuse or neglect of the child. Tex. Fam. Code Ann. § 161.001(1)(O). Appellant concedes that Terrence was in the Department's custody for at least nine months and does not dispute that he was removed as a result of abuse or neglect. Instead, he argues that the Department did not meet its burden of proof to establish that he failed to comply with the trial court's order requiring him to complete the requirements of the service plan.[3]

Terrence was born on July 16, 2009. In June 2010, appellant went to jail after being charged with an offense for which the grand jury later no-billed him. While he was in jail, the Department removed Terrence from his mother (Mother) after police found her passed out in a car that was parked in an alley, with the windows rolled up and no air conditioning on.[4] Terrence was in the back seat with his cousins, tied into his carseat because the straps were broken.

Appellant was released from jail in September 2010. He testified that as soon as he got out of jail, he and his mother went to the Department's offices to

---

[3]According to appellant, "[t]his is the Department's best termination ground but basic ideas of fairness require it to be reversed."

[4]Mother signed an affidavit relinquishing her rights and did not appeal the termination order.

find out how to get Terrence returned to him. But appellant had not yet been confirmed as Terrence's father, and he had requested that DNA testing be performed to confirm whether Terrence was his biological child. Test results confirmed paternity in October 2010. A Department supervisor testified that a service plan should have been prepared at that time, but the caseworker assigned to the case did not prepare one until January 2011. That service plan, which the trial court incorporated as an order, required appellant to, among other things, comply with all current and future court orders, avoid all criminal activity and any persons engaging in criminal activity including persons using illegal drugs, maintain and obtain a legal source of income, obtain and maintain a safe and stable home environment, complete random drug screens on the date requested, and test negative for illegal substances. Appellant signed the service plan.

Appellant admitted at trial that he had failed to comply with all of the court orders in this case.

In particular, appellant admitted that he had failed to obtain stable employment and housing. He explained that he could not find steady work because he did not have an ID card; although Department workers tried to help him obtain his Oklahoma birth certificate and other documents he would need to obtain an ID card, he was still waiting on his birth certificate at the time of trial. Appellant testified that after he got out of jail, he lived in a house next door to his mother that she owned, but the Department made him move because his

5

brother, whom the Department suspected was a drug user, lived with his mother next door, and they were concerned about the situation. Without living in the house owned by his mother, appellant could only afford to sleep at friends' houses on a temporary basis or in a hotel when he could get the money. But appellant testified that the Department allowed him to move back into the house next to his mother's in January 2011, and except for when he went to rehab in March and April 2011, he continued to live there until the time of trial. At the time of trial, he paid utilities for that house but no rent. He did not have a full-time job; instead, he worked at odd jobs.

Appellant also admitted that he had smoked marijuana before going to rehab in March 2011, but he denied using methamphetamine. The intake from rehab, however, shows that he told the counselor he had smoked both marijuana and methamphetamine in the thirty days before attending rehab and that he had used drugs multiple times in the week before rehab. He said he smoked the marijuana because he was depressed about his friend's committing suicide and his son's being in the Department's care. Mother testified that she used methamphetamine with appellant before and after he went to rehab.

Appellant admitted that he did not submit to random drug screens and did not submit to hair follicle testing ordered by the trial court[5] in January 2011; he

---

[5]When appellant was in the office and was asked for a hair sample, they could not find one because he had shaved all his body. Appellant said that was his practice. The trial court's order stated that appellant's failure to provide a specimen would be deemed a positive result.

said he tried to schedule weekly drug tests with CPS instead to build up a positive case history. The Department supervisor testified that appellant never requested weekly drug tests, and although he had refused every other drug test requested by the Department, he specifically requested one on July 29, 2011. She thought he must have believed he would be clean that day and not the others. The Department was never able to get a baseline drug test to compare to future tests. Appellant admitted being an addict. He also failed to provide the Department with a medical release so that they could obtain medical and mental health records.

Mother testified that in January 2011, appellant came into the place where she was then living, pushed her, and cut the finger of a man she was living with. She was pregnant with appellant's second child at the time. In February 2011, he showed up at Dollar General where she was shopping and hit her on the side of her face. In June 2011, he hit her on the side of her face with a beer bottle and left hand marks on her arm. But Mother testified that she would not press charges against appellant because she loved him. She said that there had been only a couple of instances of domestic violence in the past before Terrence's removal but things "really went downhill" after that.

The Department supervisor testified that she participated in making appellant's service plan and going over it with him. She also testified that the Department made information available to appellant to help him complete his service plan, but "[t]here was very little cooperation."

7

**Analysis**

Despite appellant's admission that he failed to comply with his service plan, his argument is that he substantially complied with the material terms of the plan. But it is well settled that the family code does not provide for excuses for failure to complete court ordered services, nor does it consider "substantial compliance" to be the same as completion. *See In re S.G.*, No. 02-11-00122-CV, 2011 WL 5527737, at *4 (Tex. App.—Fort Worth Nov. 10, 2011, no pet.) (mem. op.); *In re M.C.G.*, 329 S.W.3d 674, 675–76 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) (op. on reh'g). Rather, any excuse for failing to complete a family services plan goes only to the best interest determination. *In re S.G.*, 2011 WL 5527737, at *4.

Based on the above evidence, including appellant's explicit admissions that he failed to complete certain aspects of the service plan, we conclude and hold that the evidence is legally and factually sufficient to support the jury's finding that appellant failed to comply with a court-ordered service plan as set forth in family code section 161.001(1)(O). *See In re T.N.F.*, 205 S.W.3d 625, 630–31 (Tex. App.—Waco 2006, pets. denied), *overruled in part on other grounds by In re A.M.*, No. 10-12-00029-CV, 2012 WL 3242733 (Tex. App.—Waco Aug. 9, 2012, no pet. h.) (mem.op.). We overrule appellant's seventh and eighth issues.

Because we have held that the evidence is sufficient to support the jury's findings on at least one of the conduct grounds, we need not address appellant's

8

second through sixth issues challenging the other conduct grounds found by the jury. *See In re S.B.*, 207 S.W.3d 877, 886 (Tex. App.—Fort Worth 2006, no pet.).

## Sufficiency of the Evidence on Best Interest

In his first issue, appellant contends that the evidence is legally and factually insufficient to support the jury's finding that termination was in Terrence's best interest.

### Applicable Law

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2008). The following factors should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment:

(1) the child's age and physical and mental vulnerabilities;

(2) the frequency and nature of out-of-home placements;

(3) the magnitude, frequency, and circumstances of the harm to the child;

(4) whether the child has been the victim of repeated harm after the initial report and intervention by the department or other agency;

(5) whether the child is fearful of living in or returning to the child's home;

9

(6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

(7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9) whether the perpetrator of the harm to the child is identified;

(10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

(A) minimally adequate health and nutritional care;

(B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;

(C) guidance and supervision consistent with the child's safety;

(D) a safe physical home environment;

(E) protection from repeated exposure to violence even though the violence may not be directed at the child;  and

(F) an understanding of the child's needs and capabilities;  and

(13) whether an adequate social support system consisting of an extended family and friends is available to the child.

*Id.* § 263.307(b); *In re R.R.*, 209 S.W.3d at 116.

Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(A)    the desires of the child;

(B)    the emotional and physical needs of the child now and in the future;

(C)    the emotional and physical danger to the child now and in the future;

(D)    the parental abilities of the individuals seeking custody;

(E)    the programs available to assist these individuals to promote the best interest of the child;

(F)    the plans for the child by these individuals or by the agency seeking custody;

(G)    the stability of the home or proposed placement;

(H)    the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)    any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

These factors are not exhaustive; some listed factors may be inapplicable to some cases, and other factors not on the list may also be considered when appropriate. *In re   C.H.,* 89 S.W.3d at 27.  Furthermore, undisputed evidence of

11

just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

**Analysis**

Terrence was only two and one-half years old at the time of trial. Appellant testified that he and Terrence were bonded with each other and that they would tell each other they loved each other. Terrence was healthy when he was born and did not have any significant medical problems or special health needs before or after removal other than being behind on his immunizations. Terrence was developmentally on target and had been evaluated by ECI,[6] but he did not qualify for services.

The Department supervisor testified that the Department had opened a prior case on Terrence, but she did not know how that case was resolved, nor did she know whether appellant had any involvement in that case. Upon removal in this case, Terrence was placed with a foster family; in February 2011, the Department placed him with appellant's mother after the trial court ordered it to do so. Terrence was later removed from the care of appellant's mother after she

---

[6]ECI stands for Early Childhood Intervention. *See In re C.H.*, No. 02-08-00239-CV, 2009 WL 2972640, at *10 (Tex. App.—Fort Worth Sept. 17, 2009, no pet.) (mem. op.).

12

refused to take a court-ordered drug test. Terrence was placed in foster care again; he was with his third foster family at the time of trial.

Because appellant was not forthcoming with the Department about his medical or mental health records, and did not complete a psychiatric evaluation through a Department provider, there was no evidence regarding any psychiatric examinations. The evidence does show that appellant is a long-time drug addict and has a history of abusive conduct toward Mother, with whom he continued to have an on and off again relationship after Terrence was removed. The Department supervisor did not think that appellant had dealt with his drug issues and could not provide Terrence with a stable home.

Although wanting Terrence to be returned, appellant and his family showed a lack of cooperation with the Department and the CASA worker. The Department supervisor testified that appellant was "frustrated, angry, and belligerent" and not open to suggestions and help from the Department. However, appellant also testified that he had a hard time obtaining help from the Department setting up the necessary counseling and psychiatric appointments, and there was evidence that the first caseworker was negligent in originally setting up the service plan. According to the Department supervisor, reunification was the original goal until September 2011; the goal was changed to termination then because neither parent had made progress on their service plans. Appellant contends that the Department's lack of cooperation excuses his behavior in failing to comply with the service plan, but the Department's

omissions fail to explain appellant's continued lack of cooperation, especially with respect to drug testing and violence against Mother.

Appellant testified that if Terrence were to be returned to him, he would probably spend time going back and forth between his house and appellant's mother's house. Although the Department supervisor testified that she had no concerns about the physical safety of appellant's mother's home, a CASA case supervisor testified that appellant's mother was uncooperative with letting CASA visit Terrence while in her care. She would not answer the door of her home when the supervisor and CASA volunteer came to visit. Appellant would not cooperate with CASA either, but the supervisor only tried to contact him once, and she admitted that he could have been in rehab at the time.

Terrence's CASA volunteer met appellant's mother in her home in January 2011 the week Terrence moved in with her. Appellant's mother would only let her in the living room, but Terrence looked fine. The volunteer had a difficult time getting back to the house to visit, however; no one would return her phone calls and no one would come to the door. She tried to visit about twenty times, sometimes several times a day over a three-month period; she got in only one time because a man was walking out the door, and she caught him with the door open. At that time, Terrence was dirty, his pajamas were soiled, and he smelled as if he had not been bathed. In addition, the house was so cold she could see her breath in the air. Appellant's mother would not let her into the rest of house, so she did not know where Terrence was sleeping.

According to the CASA volunteer, Terrence was doing very well in foster care. Appellant's interactions with him during visitation were positive. She thought that his parents loved him, but she did not think they could handle being together and raising children. The volunteer was not in favor of termination but rather relinquishment with an open adoption. Nevertheless, she thought termination was in Terrence's best interest.

The Department supervisor testified that Terrence would be easy to adopt; he had not had problems at any of his placements. Although his then-current foster family had not expressed an interest in adopting him, one of his former foster families had.

Although some factors in the best interest analysis do weigh in appellant's favor, particularly his love for and bond with his young child, we cannot say that the evidence weighing in favor of termination is insufficient. The jury could reasonably have chosen to believe from the evidence that appellant had not dealt with his drug addiction and was attempting to conceal that fact from the Department, did not have a supportive or stable home environment for Terrence, was not equipped to parent Terrence adequately, and had not changed his own destructive patterns of conduct, particularly toward Mother. Accordingly, we conclude and hold that the evidence is legally and factually sufficient to support the jury's finding that termination was in Terrence's best interest. We overrule appellant's first issue.

**Conclusion**

Having overruled appellant's dispositive issues, we affirm the trial court's judgment.

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL:  LIVINGSTON, C.J.; DAUPHINOT and GARDNER, JJ.

DELIVERED:  September 13, 2012